# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LORA L. THOMAS, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 10 C 2634** |
| | ) | |
| MICHAEL J. ASTRUE, | ) | **Magistrate Judge Morton Denlow** |
| Commissioner of Social Security, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Lora Lee Thomas ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Claimant raises the following issues: (1) whether the ALJ properly favored the testimony of the medical expert over the opinions of Claimant's treating and examining physicians in her determination of Claimant's residual functional capacity; (2) whether the ALJ properly evaluated Claimant's credibility; and (3) whether the ALJ failed to consider all of Claimant's impairments in combination and in doing so posed an improper hypothetical question to the vocational expert. For the following reasons, the Court grants Claimant's motion for summary judgment and remands the case to the Commissioner for further proceedings consistent with this opinion.

# I. BACKGROUND FACTS

## A.    Procedural History

Claimant initially applied for DIB and SSI on April 30, 2007, alleging a disability onset date of January 26, 2007. R. 189, 194. The Social Security Administration ("SSA") denied her applications on June 14, 2007. R. 110–11. Claimant then filed a request for reconsideration, which was denied on November 21, 2007. R. 148–55. Thereafter, Claimant requested a hearing before an ALJ. R. 122–23.

On January 12, 2009, Administrative Law Judge Mona Ahmed (the "ALJ") presided over a hearing at which Claimant appeared with her attorney, Charles Olinger. R. 37–105. In addition to Claimant, Dr. Walter Miller, Jr., a medical expert, and Lee Knutson, a vocational expert, also testified. On August 28, 2009, the ALJ issued a decision finding Claimant was not disabled under the Social Security Act. R. 18–32. Specifically, the ALJ found Claimant had "the residual functional capacity to perform a range of light work" and that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." R. 25, 31.

Claimant then filed for a review of the ALJ's decision to the Appeals Council. R. 17. On March 10, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. R. 2–12. Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.    Hearing Testimony – January 12, 2009

### 1.      Lora Lee Thomas – Claimant

At the time of the hearing, Claimant was 39 years old.  R. 43.  She currently lives in a house with her adult son and one grandchild.  R. 43–44.  Claimant's highest level of education is an associate's degree in applied science, and she formerly worked as a mortician.  R. 45.  Claimant's most recent gainful employment ended in January 2007, when she stopped working at a traffic director position following a neck surgery.  R. 26, 46–47.  She also served briefly in the military in 2004 but was discharged for hip and shoulder injuries suffered in a fall.  R. 45, 92.  Claimant complained of "severe migraines," "numbness in [her] hand and arm," and being unsteady on her feet.  R. 47.  Claimant's only income is from disability benefits she receives through the Veterans Administration, with a forty-percent disability rating related to hip and shoulder injuries.  R. 45.

Claimant testified that she could not stand, walk or sit for prolonged periods of time due to pain and her hip condition.  R. 47, 57–58.  Claimant estimated that she could walk about a block and a half in about four minutes, but would then have to stop and rest.  R. 57.  Claimant testified that she loses her balance often, and she uses a cane when she leaves her home.  R. 52.  Claimant cannot stand in one place longer than four or five minutes because of her hip.  R. 58.  She is capable of bending at the waist, but has difficulty squatting down.  *Id.*

Claimant also described pain in her hip, neck, and shoulder, which radiates into her arm and hand.  R. 48.  This pain began before her surgery in 2007 and has continued.  *Id.*  She also reported muscle spasms in her left arm, neck, and right leg about three times a week.

R. 48, 53. Claimant testified that she experiences numbness in both of her arms and hands. R. 51. Claimant estimates that the maximum weight she can lift is six pounds. R. 59. She mitigates her hip pain by resting with her feet up about three to four hours a day. R. 54. When she sits in a chair without her feet up, she experiences pressure on her hip. R. 56.

Claimant began having migraines in October 2006. R. 48. These headaches occur an average of once or twice a week and last between twelve and forty-eight hours. R. 48–49. When experiencing migraines, Claimant feels nauseous and stays in bed to avoid noise and light. R. 49. Claimant was taking Verapamil to prevent migraines and had previously taken Zomig as a migraine abortive, although her neurologist was going to replace Zomig with an injected medicine. R. 50.

According to Claimant, she does dishes, laundry, and sweeps the house and her shoulder and neck hurt afterwards. R. 52. Claimant owns a car which she occasionally drives. R. 44. Typically Claimant's neighbor drives her around because her muscle spasms cause her to pull the car over quite often. R. 44–45. Claimant's son takes her out to shop for groceries every two weeks. R. 52. She cooks about twice a week and her son prepares meals the rest of the time. R. 53. Claimant is right-handed and can use that hand to button her clothes, use a pen to write, feed herself with utensils, and lift cups. R. 44, 59.

**2.** **Dr. Walter Miller Jr. – Medical Expert**

Dr. Walter Miller, Jr. testified as a medical expert ("ME").  R. 61-90.  He noted that Claimant's documented impairments include a cervical herniated disc, a brachial plexus[1] injury, a fractured right hip followed by open reduction internal fixation surgery, and an impingement in her left shoulder.  R. 61, 65–66.  The ME stated that there was nothing in Claimant's medical records to document why she was having trouble with her right hip and that it was unclear why the Claimant needed to avoid bearing weight on her right leg.  R. 61.  According to The ME, there was nothing in the record that described a failed healing of her right hip, but there are x-rays of the hip showing it healed after the surgery.  R. 64, 70.

The ME noted that there was a question of compression of the spinal cord and that there was insufficient documentation existed in the medical records as to why Claimant was diagnosed with a brachial plexus injury.  R. 61–62.  The ME stated that more than one disk injury in the cervical vertebra would be necessary to cause a brachial plexus injury.  R. 63.  One doctor referenced an EMG[2] that was supposed to support a finding of a brachial plexus injury, but the ME did not see that EMG in the record.  R. 68.

In regards to the Claimant's tingling in her fingers and spasms in her left upper arm, the ME stated that there was no evidence of a radial nerve injury in the record and no

---

[1] The brachial plexus is a complex network of nerves that branches off the spine and supplies nerves to the chest, shoulder, and arm.  *Merriam-Webster's Medical Dictionary* (2007).

[2] "EMG" is short for electromyogram, a tracing made with an electromyograph.  An electromyograph is an instrument that "converts the electrical activity associated with functioning skeletal muscle into a visual record or into sound" and can be used to diagnose neuromuscular disorders.  *Merriam-Webster's Medical Dictionary* (2007).

documentation that the spasticity in her arm was caused by a brachial plexus injury. R. 63. The ME testified that an EMG was needed to show evidence of nerve damage in her right forearm. R. 76–77. Additionally, there should be atrophy or sensory loss observed in conjunction with the EMG. R. 78–79. He testified that he would need to see a complete report by the person who conducted the test to know if that occurred. R. 79.

The ME found evidence for tendinitis in the shoulder and some weakness in the left hand that would result in a five percent limitation in the use of her left hand. R. 84. It was unclear what caused those problems, though the ME stated that it could have been caused by a brachial plexus injury, surgery in the cervical spine fusion, or a residual injury. *Id.* The ME found no evidence that the Claimant could not use her left hand at all. *Id.* The ME then testified that Claimant could use her left hand to handle objects for up to one-third of the day and that she could use her left hand to manipulate smaller objects. R. 86.

As for Claimant's migraines, the ME stated that Claimant's migraines cannot be diagnosed by an MRI and are being treated by a broad range of medications. R. 63–64. The ME testified that he did not know anything about Claimant's future sub-cutaneous treatment for her migraines. R. 90.

The ME testified that based on the record, Claimant would be capable of lifting twenty pounds occasionally, and ten pounds frequently. R. 64. Additionally, he concluded that Claimant would be able to stand six out of eight hours, with no restrictions on sitting. *Id.* There were no MRI tests showing that Claimant's ability to use her left arm was limited, although Claimant has an impingement in her left shoulder which limits her ability to use her

arms above her head. R. 65–67. The ME testified he could not conclude that Claimant had significant limits in using her arms and hands without seeing supporting EMG data. R. 68. The ME thus concluded that Claimant has no significant limitations on using her hands or fingers but that she does have muscle weakness in her left arm, shoulder, and hand. R. 66–68.

The ME also noted that insufficient documentation existed to supported chronic bursitis in Claimant's hip. R. 70–71. While there was a medical opinion indicating that Claimant needed a cane or walker to ambulate, the ME stated that he did not see objective tests supporting that opinion. R. 71. The Claimant suffered a ten-degree loss in hip flexion, which the ME testified is not a substantial deficit. R. 72.

### 3. Lee Knutson – Vocational Expert

Lee Knutson testified as a vocational expert ("VE"). R. 91-98. The VE testified that the Claimant had past work experience as a traffic clerk. R. 92. This is semi-skilled work that is generally performed at the sedentary level, but the Claimant performed at the light exertional level. *Id.* Claimant's other past work experience included positions as a deli clerk, which was medium exertion and unskilled; funeral director/embalmer, which was heavy exertion and skilled; secretary, which was sedentary and skilled; cashier, which was light exertion and unskilled; and exterminator, which was light exertion and skilled. *Id.* The VE testified that Claimant's work in the Army was not significant because it was short-lived, but that the work was very heavy exertion and semiskilled. *Id.*

The ALJ presented the VE with a detailed hypothetical person:

> Exertional capacity is light as defined, so twenty pounds lifting occasionally, ten pounds frequently, standing and walking can be done six of eight. Sitting can be done six of eight. No more than occasional overhead reaching with the left non-dominant hand. No more than occasional fingering also with the left non-dominant hand.

R. 93.

The VE stated that this hypothetical person would not be able to perform Claimant's past relevant work. *Id.* The VE testified that this person could perform positions at the light exertion level. *Id.* Most of these positions were unskilled and included jobs such as information clerk, usher, or parking lot attendant. R. 93–94, 96. The VE stated that these jobs are all available in the Chicago metro area. R. 94.

The ALJ then asked the VE to consider the same hypothetical person who could not climb ladders, ropes, or scaffolds and who could only occasionally stoop, kneel, crouch, and crawl. *Id.* The VE testified that these reduced abilities would not change the answer. *Id.* Finally, the ALJ further restricted the hypothetical person, changing the exertion level to sedentary. *Id.* The VE testified that this person could work as a surveillance system monitor and as a sedentary and unskilled information clerk. R. 94–95, 97. The VE stated that these jobs are all available in the Chicago metro area. R. 94–95. The VE stated that any of the unskilled jobs he quoted would allow employees to miss work no more than ten percent of the time, so an employee would lose her job if regularly absent two or more times per month. R. 96.

## C.     Medical Evidence[3]

### 1.     Neck Surgery at Hines Veterans Affairs Medical Center

Claimant has received treatment at the Hines Veterans Affairs Medical Center ("VAMC") since at latest December of 2005.  R. 587.  In February 2007, she presented to the neurosurgery clinic with a history of left shoulder pain radiating down to the 4th and 5th digits of her left hand.  R. 274.  An MRI demonstrated a C6–7 disk herniation.  *Id*.

Claimant underwent a cervical C6–7 anterior cervical diskectomy[4] and fusion on January 29, 2007 without complication.  R. 274.  Two days later, on January 31, Claimant was discharged.  *Id.*  Upon discharge, Claimant was advised to not lift more than ten pounds, not to reach overhead, and not to drive while on medication.  *Id*.  On February 8, Claimant reported significant improvement in the numbness in her left arm, but she complained of intermittent left shoulder pain, weakness, and occasional headaches.  R. 294.

### 2.     Continuing Treatment at the Hines Veterans Affairs Medical Center

On March 22, 2007, Claimant had her two-month follow-up at the neurosurgery clinic.  R. 293.  She reported significant improvement in the pain and muscle spasms in the left arm,

---

[3] In addition to the evidence discussed below, the Commissioner cites additional opinions provided by two physicians who reviewed Claimant's file.  Because the ALJ did not discuss this evidence in her decision, it cannot be used to affirm her decision, unless the overlooked evidence make it "predictable with great confidence that the agency will reinstate its decision on remand." *Spiva v. Astrue*, --- F.3d ---, 2010 WL 4923563, at *6 (7th Cir. Dec. 6, 2010) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943)).  The Commissioner makes no argument that the evidence here would have such an effect, so the Court will not consider it.

[4] A diskectomy is the "surgical removal of an intervertebral disk." *Merriam-Webster's Medical Dictionary* (2007).

but she complained that her arm and hand continued to tingle and that she had daily headaches and pain and numbness along her neck incision. *Id.* Claimant was advised to start physical therapy and not return to work until the therapy was completed. *Id.* Dr. Cristina Orfei began treating Claimant in the neurology clinic on March 28. R. 502. At that time, Claimant reported the onset of neck pain radiating through her entire scalp in the form of a throbbing headache. *Id.*

On April 17, 2007, Claimant visited the orthopedic clinic with hip pain related to hip surgery that occurred two years earlier. R. 499. A doctor recommended that Claimant would benefit from removal of screws from her hip. *Id.* On April 23, Claimant returned to the clinic for an evaluation of her left shoulder. R. 499. An MRI showed a small muscle tear with tendinopathy. *Id.* Claimant also had pain with flexion and internal rotation of the shoulder, weakness of the left upper extremity, and limited cervical spine flexion and extension. R. 498.

On June 7, 2007, Claimant returned to the neurosurgery clinic with complaints of headaches and left shoulder pain radiating to the 4th and 5th digits at preoperative levels. R. 987. At that time, Dr. Peter Letarte cleared her for shoulder and hip surgery. *Id.*

On July 17, Claimant again saw Dr. Orfei, this time complaining of severe headaches and nausea that lasted two to three days. R. 918–19. Dr. Orfei also noted limitations in Claimant's cervical spine movements. *Id.* She diagnosed migraines that were persistent and worsening and prescribed Topiramate and Zomig. R. 919. At a follow up with Dr. Orfei on August 21, Claimant reported partial improvement of her headaches. R. 914.

On September 7, 2007, Claimant underwent right hip hardware removal surgery. R. 879. At a follow-up on September 18, she noted pain improvement, but also had complaints of her right leg giving out periodically. R. 878. At that time, she had a slow gait with the use of a walker and was scheduled for physical therapy. *Id*.

Doctor Orfei was the first of five doctors to complete an impairment questionnaire for Claimant. In a multiple impairment questionnaire completed on October 9, 2007, Dr. Orfei gave Claimant a fair prognosis with cervical pain for a C6–7 herniated disk, a right femoral neck stress fracture, and a left rotator cuff tear. R. 937-44. Dr. Orfei rated Claimant's pain as a six to seven on a ten-point scale and her fatigue as four on a ten-point scale. R. 939. Dr. Orfei further noted that in an eight-hour work day, Claimant could sit for one hour and stand or walk for less than an hour. *Id*. She recommended that Claimant only occasionally lift or carry no more than five pounds. R. 940. Dr. Orfei also noted that Claimant was essentially precluded from the use of the left arm and hand for activities such as grasping, turning, and fine manipulations. *Id*. Finally, Dr. Orfei stated that Claimant needed to rest approximately once every hour for thirty minutes during an eight-hour day and that she would be absent from work more than three times a month due to her impairments. R. 942–43.

In November 2007, Carl Hermsmeyer, Ph.D., reviewed Claimant's file on behalf of a state agency and reported that Claimant had no severe mental impairments. R. 946-59. He noted that Claimant had little history of seeking mental health treatment and had never received inpatient psychiatric care. R. 958.

On January 10, 2008, Claimant underwent shoulder surgery. R. 1238. Dr. Letarte had opined that a chronic nerve root injury was behind the pain in her shoulder. R. 986. Claimant returned for follow-up at the orthopedic surgery clinic on January 18, reporting pain when letting her arm hand and when testing her shoulder's strength. R. 1238. The doctor recommended exercises and pain control for treatment. *Id.* On a February 1 follow-up in the orthopedic surgery clinic, Claimant complained of persistent left shoulder pain and pain near the incision for the hip hardware removal surgery. R. 1234. The attending physician advised Claimant to follow up with her neurosurgeon and continue pain medications and physical therapy. *Id.* Claimant continued to complain of chronic pain in the following months. One attending physician diagnosed her with left shoulder pain post surgery, bicipital tendinitis, activities of daily living impairment, depression, and insomnia. R. 1106. Another resident saw Claimant on March 3 who noted that her year-long use of Vicodin put her at risk for developing a dependence . R. 1217. This resident recommended Claimant follow up with the neurology clinic to discuss pain control. *Id.* Dr. Orfei saw Claimant in the neurology clinic on March 12. R. 1207. In response to Claimant's continued pain and headaches and a concern about the potential for Vicodin dependency, Dr. Orfei prescribed Zomig, Desipramine, Baclofen, and Gabapentin. R. 1209.

Meanwhile, Claimant also began to seek treatment for mental health issues. Claimant went to the mental health clinic on February 12, 2008, and was diagnosed with depression. R. 1158. She was referred for a psychiatric assessment and individual therapy. *Id.* Dr. Adam

Karwatowicz[5] saw Claimant in the psychiatry clinic on March 17. R. 1204. He diagnosed post-traumatic stress disorder ("PTSD") and depressive disorder and advised Claimant to start Zoloft and therapy. R. 1206.

Dr. Samuel Koo[6] evaluated Claimant in the orthopedic surgery clinic on April 11, 2008 and gave her a small prescription of Vicodin for short-term pain control. R. 1196. Dr. Koo suspected that her continued pain was caused by Claimant's chronic neck pathology. *Id*. Dr. Koo completed an upper extremity impairment questionnaire for Claimant during this same visit. R. 1035–39. He gave her a guarded prognosis and cited an MRI that showed a torn rotator cuff to support his findings. R. 1036. Dr. Koo reported that Claimant could only occasionally lift or carry up to ten pounds with her left arm. R. 1037. He further stated that Claimant would need to take several breaks an hour during an eight-hour day and that she would be absent from work more than three times a month as a result of her injuries and treatment. R. 1039.

Dr. Adam Karwatowicz completed a psychiatric/psychological impairment questionnaire for Claimant on April 16, 2008. R. 1021–27. He provided a guarded prognosis for her PTSD and depression, noting sleep and mood disturbances and general anxiety, among other symptoms. R. 1022. Dr. Karwatowicz also stated that Claimant was markedly limited in almost all aspects of memory, concentration and persistence, social interactions, and adaptation. R. 1024–1025. Finally, Dr. Karwatowicz stated that Claimant could not

[5] The ALJ mistakenly referred to Dr. Karwatowicz as "Dr. Koriotowicz." R. 24

[6] The ALJ mistakenly referred to Dr. Koo as "Dr. Koth." R. 27.

handle even minimal stress and would be absent from work more than three times a month. R. 1026–27.

Also on April 16, Dr. James McFadden completed a hip impairment questionnaire on Claimant. R. 1028–34. Dr. McFadden reported that Claimant could walk only with the assistance of a cane or walker. R. 1030. He further stated that Claimant could sit for two hours and walk for one hour of an eight-hour work day that she could occasionally lift or carry ten pounds and that should would be absent from work more than three times a month. R. 1031–33. Dr. McFadden noted that his assessment was based on a sole meeting and evaluation of Claimant. R. 1034.

Dr. Orfei completed a headaches impairment questionnaire on Claimant on April 21. R. 968–72. She noted that Claimant had severe headaches associated with nausea, mood changes, and photosensitivity. R. 969. Dr. Orfei related that she had advised Claimant to take Zomig and lie in a dark room to cope with the headaches. R. 970. Dr. Orfei concluded that Claimant was incapable of tolerating even low stress and would be absent from work more than three times a month as a result of her impairment and treatment. R. 972.

Throughout the summer and fall of 2008, Claimant saw Drs. Karwatowicz and Orfei who continued to treat and observe her mental and physical pain through medication and therapy. No significant changes in her condition were observed. R. 1180–87, 1427–29, 1153–54, 1165–66. On November 19, 2008, Claimant went to the orthopedic surgery clinic. R. 1418. She reported bad left shoulder pain and right hip pain. *Id*. The attending physician recommended physical therapy. *Id*.

Evidence emerged at the end of 2008 that Claimant may also have nerve damage on her right side. An EMG dated December 10, 2008 produced data consistent with nerve damage in the right forearm and chronic nerve root damage on the right side of Claimant's spine. R. 1413.

On January 5, 2009, Claimant complained to Dr. Orfei that she continued to experience migraines twice a week that were not responding to her medications. R. 1407. In response, Dr. Orfei prescribed subcutaneous treatment for the headaches. *Id.* During this same visit, Dr. Orfei also noted decreased range of motion in the left shoulder. She also noted that the recent EMG suggested nerve damage on Claimant's right side, in addition to the left-side injuries diagnosed in a 2007 EMG. *Id.*

Claimant has also submitted certain medical records dated after the ALJ issued her decision on August 28, 2009, although the Court cannot consider that evidence in reviewing the ALJ's decision.[7] Dr. Karwatowicz completed a second psychiatric/psychological impairment questionnaire for Claimant on November 25, 2009. R. 1494-1509. His opinions were similar to the prior questionnaire. *Id.* Dr. Orfei also completed a second headaches impairment questionnaire for Claimant on November 27, 2009. R. 1440–52. Her findings were also similar to those in her earlier questionnaire. *Id.*

---

[7] Evidence that relates to a period after the ALJ's decision cannot serve as a basis for overturning the decision. *Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008). Rather, if a claimant's health deteriorates after the ALJ issues a decision, the claimant should submit a new application for benefits. *Id.*

On January 12, 2010, Doctors Jed Haake and Michelle Ahn wrote a letter expressing "strong support" for Claimant's disability application. R. 1511–12. It noted that Claimant was currently being treated as an inpatient at a psychiatry unit because of suicidal ideations and that aspects of her condition would likely remain chronic. R. 1511–12.

### 3. M.S. Patil, M.D. – SSA Examining Physician

Dr. Patil evaluated Claimant for the SSA on October 24, 2007. R. 931–35. Claimant complained of pain in her right hip, neck, left shoulder, and migraine headaches. *Id*. Dr. Patil noted that Claimant used a cane to bear weight and for confidence, but that her gait was normal. R. 934. Further, Claimant's fine and gross manipulative movements of her hands and fingers on both her right and left hand were done without difficulty. *Id*. Dr. Patil did not assess Claimant's capacity to work.

## D. ALJ's Decision – August 28, 2009

After a hearing and review of the record and medical evidence, the ALJ determined that the Claimant had the residual functional capacity ("RFC")[8] to perform a range of light work and therefore denied her application for DIB. R. 18-32. The ALJ evaluated Claimant's application under the required five-step analysis. At step one, the ALJ found Claimant had not engaged in substantial gainful activity since January 26, 2007, the alleged onset date. R. 23. At step two, the ALJ found Claimant had the severe impairments of cervical disk disease, status post diskectomy; left brachial plexus injury; status post right hip fracture now

---

[8] The RFC is the most that a claimant can do despite the effect of his impairments. 20 C.F.R. § 404.1545(a).

healed; degenerative changes in the left shoulder with impingement; migraine headaches; and a history of depression. *Id*. At step three, the ALJ found Claimant did not have an impairment that meets or medically equals one of the listed impairments of 20 C.F.R. § 404.1525–26. *Id*.

The ALJ then proceeded to consider Claimant's RFC and found Claimant capable of performing a range of light work with the ability to lift twenty pounds occasionally and ten pounds frequently, stand or walk about six hours and sit at least six hours of an eight-hour workday. R. 25. The ALJ found that Claimant can occasionally reach overhead with the left arm and can occasionally handle and finger with the left hand. *Id.* Finally, the ALJ found that Claimant cannot climb; can only occasionally stoop, kneel, crouch, and crawl; and can only perform simple and routine tasks. R. 25.

The ALJ found the Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible. R. 29. The ALJ found that Claimant's statements regarding her symptoms were inconsistent with the record overall and therefore relied on the testimony of the ME, who explained that objective medical evidence in the record did not fully support Claimant's allegations. *Id*. The ALJ noted that Claimant had many problems and restrictions, but that the objective record did not support the alleged degree of limitation. *Id*.

The ALJ acknowledged the multiple medical opinions supporting the severity of Claimant's alleged limitations, but noted that these opinions were given in the form of check-

box questionnaires and provided little explanation. R. 29–30. The ALJ stated that because these opinions were generally based on one or two visits with the Claimant that these physicians did not have a longitudinal perspective suggesting special insight into the Claimant's condition. R. 30. The ALJ recognized that the ME was a non-examining physician, but concluded that the level of detail and explanation he provided outweighed this fact. *Id*. The ALJ gave the examining and treating physicians' opinions little weight. *Id*.

At step four, the ALJ found that Claimant could not perform any past relevant work as a traffic clerk, deli clerk, mortician, or secretary. *Id*. At step five, the ALJ relied on the VE's testimony and found that jobs exist in significant numbers in the national economy that Claimant can perform. R. 31. She asserted that even if Claimant were limited to a sedentary exertion level, she would have made the same decision, because the VE identified 3,600 sedentary, unskilled jobs in the region. R. 32. The ALJ therefore concluded that Claimant was not disabled under the Social Security Act. *Id*.

## II.  LEGAL STANDARDS

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A decision by an ALJ becomes the Commissioner's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000). Under such circumstances, the district court has jurisdiction to review the ALJ's decision. *Id*. Judicial review is limited to determining whether the decision is supported by substantial evidence in the record and

whether the ALJ applied the correct legal standards in reaching his decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A "mere scintilla" of evidence is not enough. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The ALJ need not address every piece of evidence or testimony presented, but rather must provide a "logical bridge" between the evidence and the ALJ's conclusions, so that a court can assess the agency findings and afford the claimant meaningful judicial review. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings. *Nelms*, 553 F.3d at 1097. The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

**B.    Disability Standard**

Disability insurance benefits are available to a claimant who can establish she is under a "disability" as defined in the Social Security Act. *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual is under a disability if she is unable to do her previous work and cannot, considering her age, education, and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

Social security regulations prescribe a five-step sequential analysis for evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v). Under this approach, the ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work. *Id.* Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the burden shifts to the ALJ to show that other jobs exist in the economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

### III.  DISCUSSION

Claimant raises the following issues in support of her motion: (1) whether the ALJ properly favored the testimony of the medical expert over the opinions of Claimant's treating and examining physicians in her determination of Claimant's residual functional capacity; (2) whether the ALJ properly evaluated Claimant's credibility; and (3) whether the ALJ failed to consider all of Claimant's impairments in combination and in doing so posed an improper hypothetical question to the Vocational Expert.

**A.     The ALJ Did Not Properly Weigh the Medical Opinions.**

**1.     The ALJ Failed to Provide Sufficient Reasons for Discounting Treating Physicians' Opinions.**

An ALJ makes a RFC determination by weighing all the relevant evidence of record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).  In doing so, an ALJ must determine what weight to give the opinions of the claimant's treating physicians.  20 C.F.R. § 404.1527.  A treating physician's opinion is entitled to controlling weight if it is supported by the medical findings and not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(d)(2); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  An ALJ must offer "good reasons" for discounting a treating physician's opinion.  20 C.F.R. § 404.1527(d)(2); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).  In other words, the ALJ must point to some "well-supported contradictory evidence" before discounting the opinion.  *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006).

Here, the ALJ failed to provide sufficient reason for rejecting a number of treating source opinions.  Doctors Orfei, Karwatowicz, and Letarte all saw Claimant many times and undoubtedly constituted treating physicians.  The ALJ credited the ME's opinions over those of the treating sources, but that testimony failed to provide well-supported contradictory evidence on a number of important points.

Concerning the alleged brachial plexus injury, the ME repeatedly stated that he would need to see EMG results before diagnosing the level of nerve damage and impairment that

Claimant stated she suffers in her left arm and hand. Apparently, he did not see in the record some of the test results on which the treating sources relied. But testimony by the ME that he had insufficient information is quite different than contradictory evidence. Although an ALJ may reject a treating physician's opinion if it conflicts with other substantial evidence in the record, "a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel*, 345 F.3d at 470. If, for instance, the ME had identified a test that evinced little or no nerve damage, then the ALJ would have had a contradictory opinion supported by objective evidence. On the other hand, the ME's testimony here merely suggests that critical evidence on which treating sources relied does not appear in the record. Thus, the ME's testimony on the brachial plexus issue is not well-supported contradictory evidence.

If the ALJ thought that the ME needed to see certain tests or other evidence relied on by Claimant's doctors, she should have attempted to obtain the desired documentation. *See* SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996) (ALJ "must make every reasonable effort to obtain available information that could shed light on the credibility of the individual's statements"). Social Security proceedings are inquisitorial, not adversarial, so the ALJ has a duty to develop arguments both for and against granting benefits. *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).

Claimant also alleged a problem with her left shoulder joint, separate from the brachial plexus injury. Concerning Claimant's alleged shoulder impingement, the ALJ again relied on the ME's opinion, asserting that Dr. Koo's opinion was "extreme and not supported, with little evidence of ongoing attention to the shoulder problem." R. 30. The ME allowed

that Claimant's left shoulder had an impingement secondary to arthritic effects, but he asserted that Claimant could reach overhead occasionally with her left arm. R. 65–66. Nowhere did the ALJ cite objective evidence contradicting Dr. Koo's opinion that Claimant's shoulder injury resulted in much more severe limitations. Dr. Koo had physically examined Claimant's shoulder, R. 1196, and he cited an MRI test that apparently did not appear in the record. R. 1036. The radiology report for this MRI suggests "degenerative changes" in Claimant's left shoulder. Because he saw Claimant only once, Dr. Koo may not have had the longitudinal perspective to merit controlling weight, but an examining source's opinion is still generally entitled to more weight than a non-examining source. 20 C.F.R. § 404.1527(d)(1). The ALJ should have at least discussed the objective evidence for Dr. Koo's opinion before rejecting it.

The ALJ also failed to highlight well-supported evidence contradicting Dr. Orfei's opinion about Claimant's migraines. The ME did not testify extensively on this point, and indeed he admitted that he was not familiar with the subcutaneous treatment that Claimant received for her migraines. The ALJ merely asserted that "the treatment records do not show [the] level of frequency or severity" asserted by Dr. Orfei. R. 30. Without further explanation, the ALJ's reasoning leaves the impression that she overlooked Dr. Orfei's treatment notes. The record shows that Claimant frequently complained of migraines to Dr. Orfei; that Dr. Orfei diagnosed persistent and worsening migraines as early as 2007; and that Dr. Orfei ordered a change in treatment in January 2009, out of concerns that Claimant was

still experiencing two migraines per week. The ALJ therefore failed to identify evidence contradicting Dr. Orfei's opinion concerning Claimant's migraines.

Concerning Claimant's hip impairment, the ALJ again relied on the ME's testimony but also presented her RFC finding as consistent with Dr. Letarte's opinion that Claimant could only sit for two-hour stretches. R. 28, 30. The ME testified that to support the degree of limitation asserted in Dr. McFadden's impairment questionnaire, he would expect to see evidence that the hip failed to heal after surgery or evidence of bursitis. R. 28, 71. If Claimant had bursitis, the ME testified that he would expect to see evidence of tenderness. Instead, he pointed to an x-ray showing that Claimant's hip healed following surgery and to Claimant's ten-degree loss of flexion in her hip, which is not a substantial deficit. R. 28. But the ALJ ignored a line of evidence suggesting that Claimant's hip condition may have been more severe. The record contains repeated reference to tenderness in Claimant's hip. R. 921, 1028, 1234, 1418. And Dr. McFadden's impairment questionnaire cited an x-ray to support his findings. R. 1029. The ALJ also failed to discuss Dr. Orfei's multiple impairment questionnaire, which noted Claimant's hip pain and concluded that Claimant could only sit for one hour out of each day. R. 939. The ME's testimony may have pointed to contradictory evidence, but the ALJ should have discussed the evidence supporting Dr. McFadden's and Dr. Orfei's opinions.

As for Claimant's mental health, the ALJ discounted Dr. Karwatowicz's opinion because the doctor lacked a longitudinal perspective, and because she found his opinion contradicted by "the lack of significant mental health treatment history, and lack of mental

status abnormalities." R. 30. The ALJ apparently relied on Dr. Hermsmeyer in making this finding, but his report predated Claimant's relationship with Dr. Karwatowicz. R. 24, 30. Dr. Karwatowicz treated Claimant from March 2008 until the adjudication of Claimant's case, and thus had a longitudinal perspective of Claimant's condition. The ALJ noted that Dr. Karwatowicz completed his impairment form after seeing Claimant only two times, R. 30, but if the ALJ was concerned that this opinion was rendered too early in the treatment, she should have referred to subsequent treatment notes to see if later treatment suggested a change in opinion.

A review of Dr. Karwatowicz's treatment notes do not reveal any marked improvement in Claimant's mental health condition. For instance, Dr. Karwatowicz continued to diagnose PTSD and depression, and he assigned a Global Assessment of Functioning (GAF) score of forty-eight in November 2008, slightly lower than the GAF score of fifty that he assigned in his impairment questionnaire. R. 1021, 1429. A GAF score between forty-one and fifty indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."[9] *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000). Ultimately, Claimant's ongoing mental health treatment and Dr. Karwatowicz's consistent diagnosis of serious

---

[9] The GAF is a scale of zero through 100 used by mental health professionals to rate the social, occupational, and psychological functioning of adults. *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 34 (4th ed. 2000).

mental health problems undercut the ALJ's reasons for dismissing Dr. Karwatowicz's opinion.

## 2. The ALJ Did Not Apply the Required Factors for Weighing Medical Opinions

Even assuming that the ALJ identified well-supported evidence that contradicted their opinions, the ALJ also failed to apply the required factors in deciding what weight to give the treating physicians' opinions. If an ALJ provides good reasons for discounting a treating physician's opinion, she must decide what weight to give that opinion by considering the factors listed in 20 C.F.R. § 404.1527(d). *Campbell*, 627 F.3d at 308. These factors include (1) the length of the treatment relationship and frequency of visits; (2) the nature and extent of the relationship, including the treatment given and extent of any examinations; (3) the supportability of the opinion in light of medical testing and the explanation given by the physician; (4) consistency with the rest of the record; (5) the physician's specialization; and (6) any other factors tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)–(6).

Concerning the first and second factors, the ALJ's decision leaves the impression that the ALJ may not have appreciated the length and frequency of treatment that Claimant received from several physicians. In discussing the weight she gave to the five physicians who filled out impairment questionnaires, the ALJ asserted that "most of these physicians provided their opinions after only one or two visits . . . which is not long enough to have developed a longitudinal perspective." R. 30. This statement may be literally true in the

sense that Dr. Karwatowicz provided his opinion early in his treatment of Claimant and two others, Dr. McFadden and Dr. Koo, examined Claimant only once. But the ALJ failed to acknowledge that three of the five physicians treated Claimant over an extended period. In fact, the ALJ incorrectly stated that Dr. Karwatowicz saw Claimant "only twice," and she did not discuss the length or frequency of treatment from Dr. Orfei or Dr. Letarte. R. 30.

The ALJ also gave short shrift to the third and fourth factors, by failing to sufficiently discuss whether the treating source explanations were consistent with medical testing and the rest of the record. The ALJ asserted that all of the opinions suggesting severe limitations came in the form of checkbox questionnaires, with little explanation. R. 29–30. Although a checkbox questionnaire by itself may be weak evidence, "the form takes on greater significance when it is supported by medical records." *Larson v. Astrue*, 615 F.3d 744, 750-51 (7th Cir. 2010). In short, the ALJ should have looked to Claimant's extensive treatment records at the VAMC to determine whether the questionnaires squared with those records. *See id.* The ALJ briefly discussed the weight she gave to each of the five individual treating physicians, though she only discussed one of the two impairment forms completed by Dr. Orfei. As detailed above, however, the ALJ failed to discuss much of the objective evidence supporting the treating sources' respective opinions. *See supra* Section III.A.1.

Finally, the ALJ seems to have overlooked the fifth factor, each physician's specialization. Although she mentioned that Dr. Karwatowicz was a psychiatrist and Dr. Letarte a neurosurgeon, R. 24, 26, the ALJ made no reference to most of the doctors'

specialties, much less discussing how their specialities affected the weight given their opinions.

Thus, a remand is necessary for the Commissioner to revisit the RFC finding. If the Commissioner cannot identify well-supported evidence contradicting Claimant's treating physicians, then the Commissioner must afford those opinions controlling weight in making the RFC finding. 20 C.F.R. § 404.1527(d)(2). If good reasons do exist for discounting the opinions, the Commissioner must nevertheless apply the factors listed in § 404.1527(d)(2)–(6) when deciding what weight to give those opinions. Claimant argues that the Court should enter a disability finding and remand simply for the purpose of calculating benefits, but the Court cannot say the record so lacks evidence against disability that a remand would be futile. The record contains the opinions of several doctors who did not believe Claimant had severe limitations, and it is possible that with a more detailed discussion of Claimant's treatment history the Commissioner could provide a sufficient rationale for a non-disability finding.

**B.      In Light of the Remand, the ALJ Should Revisit Claimant's Credibility.**

An ALJ's credibility determinations deserve special deference, because only the ALJ observes the claimant testify. *Jones*, 623 F.3d at 1160. Rather than nitpicking for inconsistencies or contradictions, courts are to give a commonsense reading to an ALJ's opinion and to reverse credibility determinations "only if they are patently wrong." *Id.* Applicants for disability benefits have an incentive to exaggerate their symptoms, so an ALJ

may discount an applicant's testimony based on other evidence in the case. *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2000).

Here, the ALJ's credibility finding was suspect insofar as it depended on an erroneous view of the medical evidence. That said, there is no need to determine whether the ALJ's credibility finding was patently wrong, because the Court has already determined that a remand is necessary. On remand, the ALJ should revisit the credibility issue to determine whether her finding remains the same after reweighing the medical evidence.

**C.    The ALJ's Hypothetical to the Vocational Expert Requires Remand Because It Was Based on an Insufficient RFC Finding.**

Claimant contends that because the ALJ erred in assessing her impairments and calculating her RFC, the ALJ's hypotheticals to the VE were flawed. Where an ALJ's hypothetical is based on an erroneous RFC finding, it must be remanded to the Commissioner for further proceedings. *See Young v. Barnhart*, 362 F.3d 995, 1004–05 (7th Cir. 2004). Here, the parties do not dispute that the ALJ's hypothetical reflected her RFC finding. As a result, the hypothetical posed to the VE must also be reconsidered in light of any new findings on remand.

## IV.  CONCLUSION

For the reasons set forth in this opinion, the Court grants the Claimant's motion for summary judgment and remands the case to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED THIS 1st DAY OF FEBRUARY, 2011.

_____
MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE

**Copies sent to:**

Charles E. Binder
Law Offices – Harry J. Binder
and Charles E. Binder, P.C.
60 East 42nd Street, Suite 520
New York, New York 10165

Counsel for Plaintiff

James E. Hail
Assistant Regional Counsel
200 West Adams Street, Suite 3000
Chicago, Illinois 60606

Michelle M. Fox
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604

Counsel for Defendant